1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    ALAN SCOTT RANDEL,                     Case No. 14-cv-05478-JST (PR)

                Petitioner,
8
                                            **ORDER DENYING PETITION FOR**
9        v.                                 **WRIT OF HABEAS CORPUS;**
                                            **DENYING CERTIFICATE OF**
10   CHUCK KEETON, Warden,                  **APPEALABILITY**

                Respondent.
11

12

13          Before the Court is the above-titled pro se petition for a writ of habeas corpus, filed

14   pursuant to 28 U.S.C. § 2254 by petitioner Alan Scott Randel, challenging the validity of a

15   judgment obtained against him in state court.  Respondent filed an answer to the petition.

16   Petitioner has filed a traverse.  For the reasons set forth below, the petition is denied.[1]

17                              **I.  PROCEDURAL HISTORY**

18          On January 25, 2011, a Sonoma County jury found petitioner guilty of three counts of

19   forcible rape (Cal. Penal Code § 261(a)(2)), forcible oral copulation (Cal. Penal Code § 288a

20   (c)(2)), dissuading a witness (Cal. Penal Code § 136.1(b)(1)), and misdemeanor child abuse (Cal.

21   Penal Code § 273a(b).  Ex. 1 at 366-67.[2]  On May 3, 2011, the trial court sentenced petitioner to

22   state prison for a total determinate term of 25 years.  Ex. 1 at 789.

23

24   _____
     [1] Petitioner initially named the State of California as the respondent in this action.  The Court later
25   substituted Brian Koehn, former warden of Florence Correctional Center, where petitioner was
     previously incarcerated.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Chuck
26   Keeton, the current warden of La Palma Correctional Center, where petitioner is now incarcerated,
     is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.
27
     [2] All references herein to exhibits are to the exhibits submitted by respondent in support of the
28   answer, unless otherwise indicated.

United States District Court
Northern District of California

On December 26, 2012, the California Court of Appeal affirmed the judgment in an unpublished decision.  Ex. 6.  The California Supreme Court denied review on March 13, 2013.  Ex. 8.  Petitioner filed habeas petitions in the state superior, appellate, and supreme courts.  Exs. 9-13.  Each was denied, and only the superior court issued a reasoned opinion.  Id.  The instant action was filed on December 16, 2014.

## II.  STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal:[3]

*A. Prosecution Case*

[Petitioner] was the stepfather of victim Jane Doe, who was about 13 years old when [petitioner] married Doe's mother.  [Petitioner], Doe, Doe's mother, and Doe's older brother lived together in an apartment in Santa Rosa for about 18 months, until Doe's mother, and then Doe's brother, moved out in the beginning of 2006.  By then, Doe was around 14 years old.  [Petitioner] assured Doe that he would take care of her and put her through college, so Doe agreed to continue living with him.

[Petitioner] was strict with Doe.  He did not allow her to talk to boys.  He often punished her by taking away her phone or iPod or forbidding her to visit her friends.  Doe testified: "A couple times he locked me in my bedroom and I wasn't allowed to go out and get anything to drink or eat and [had] to stay in for a day."  Once [petitioner] made Doe stay in her room without allowing her to use the bathroom.  He also forbade her from shutting her bedroom door and bathroom door; if she tried to shut the bathroom door, he would open it and yell at her.

[Petitioner] was physically and emotionally abusive as well.  He punched Doe in the face a couple of times, slapped her in the face, pushed her to the floor, and punched her in the arms, resulting in bruises.  One of the blows to her face caused her braces to slice her gums.  He warned Doe that if she ever told anybody, he would kill her or hurt her family or she "wouldn't have any place to live or any place to go."

When Doe was 15 years old, she and [petitioner] moved into a house.  There, Doe slept in her own bed only once.  On that night, she awoke to find [petitioner] groping her vagina and breasts, outside her clothes.  When she asked him to stop touching her and to get out of her room, he became angry.  After that, [petitioner] insisted that Doe sleep in his bed; Doe acquiesced because she felt she had no choice.

A couple of months before her sixteenth birthday, [petitioner] forced Doe to have sexual

---

[3] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

intercourse for the first time.  Doe was sitting on the bed, watching television, when [petitioner] entered and told her to sit next to him.  When she refused, he sat next to her and started to rub her thigh.  She slapped his hand away and told him not to touch her, and they argued.  He then began rubbing her vagina outside her clothes, and she told him to stop.  Doe attempted to get up, but [petitioner] pulled her back; she tried to leave, but [petitioner] blocked the door, pushed her onto the bed, held her down, and took off her pants.  [Petitioner] started to put his penis in Doe's vagina; she was crying and attempted to get up, but she was unable to.  [Petitioner] then raped her, using "a lot of force" to prevent her from escaping.  Afterward, Doe "just laid there, crying, for a while," and [petitioner] "got up and left."

From then on, [petitioner] continued to have sex with Doe, for awhile "a couple times a week."  She never consented or wanted to have sex with him.  To the contrary, Doe testified, she always told [petitioner] that she did not want to have sex with him, but "[h]e would always get mad and hit me, or he would yell back at me."  Doe even tried to push [petitioner] off of her, punch him, slap him, and throw things at him, but "[i]t just made [petitioner] mad and more angry."  Eventually, Doe stopped resisting.  She testified: "I was afraid of getting hit or slapped.  I didn't want to get hurt anymore."

Doe also tried to call the police once but, she testified, [petitioner] "threw the phone and told me, 'I wouldn't call the police,' because if I did, he would kill me."  [Petitioner] threatened Doe that if she told anybody, he would hurt her mother and brother and she would be homeless with nowhere to go.

[Petitioner] told Doe that he wanted to marry her and "have kids" with her, bought her diamond jewelry, etched their names in the concrete in front of the house, and claimed "it's not rape because we're in love."  Doe acknowledged that she did tell [petitioner] that she loved him, because he was her stepfather and because she thought he would otherwise get mad.  But she thought he was "crazy" when he said, "we're in love," because she told him "all the time" that she was *not* in love with him.

[Petitioner] nonetheless continued to assault Doe sexually until June 13, 2009.  On that day, he orally copulated her for the first time.  When Doe told him "no," [petitioner] forced his penis into her vagina.

A few days later, Doe told a friend that [petitioner] was sexually assaulting her.  At trial, the friend confirmed that Doe had cried and said that [petitioner] had been molesting her for a year and a half.

Detective Hector DeLeon of the Santa Rosa Police Department investigated Doe's complaint against [petitioner].  Doe agreed to make a pretext phone call to [petitioner], which DeLeon recorded.  In the phone conversation, [petitioner] promised Doe that he would stop having sex with her.  He apologized and said that he felt bad.  When Doe asserted that it "started when I was fifteen, almost sixteen," [petitioner] replied: "I expected too much from you."  When Doe claimed, "I told you every time I don't want to" and "[w]hat you did to me is not okay," [petitioner] did not dispute the point, but asked whether Doe was with anyone.  Doe said "raping me is not okay," and [petitioner] told her not to "say that."  He agreed not to lick her vagina.  He also acknowledged that he should not have hit Doe and that he had a bad temper.

[Petitioner] was arrested.  In an interview with Detective DeLeon, [petitioner] initially denied hitting Doe or having any sexual contact with her.  Later, he admitted that he had sex with her at least five times, and that Doe might be correct that it began in January 2008.  He also admitted that they orally copulated each other and that Doe copulated him two or three times.  [Petitioner] claimed that he and Doe were a couple and were "in love," and he expressed disbelief that Doe said the sex was not consensual.

Psychologist Anthony Urquiza, as an expert in child sexual abuse accommodation syndrome (CSAAS), testified that the components of CSAAS include the abused child's secrecy about the abuse, feelings of helplessness, disassociation, and delayed disclosure.  A number of factors present in this case, he opined, were consistent with abuse or could produce one or more of the characteristic CSAAS behaviors.

*B. Defense Case*

[Petitioner] testified that he and Doe were in love and they "told each other every day that [they] loved each other"—five times a day.  They would hug and kiss on the couch, and eventually their relationship became sexual: he touched her vagina; she touched his penis; they orally copulated each other; they had intercourse "[m]any times"; they had an "intimate sexual relationship" that "was loving, very loving"; Doe was "comfortable with" [petitioner] orally copulating her; and "Doe actually enjoyed having a sexual relationship. [petitioner] claimed that Doe would want to have sex, but he would refuse because he did not want to get her pregnant.  Once when he suggested they "make love," Doe said she did not have a ring, so he took her to pick out a ring and later bought it for her.  He denied beating, threatening, shoving, or forcibly raping Doe.

During cross-examination, the prosecutor queried [petitioner] about lies he told to Detective DeLeon during their interview.  [Petitioner] acknowledged, "Yeah throughout the whole interview, I suppose I lied."  Attempting to explain himself, he said: "All I can say for myself is I was uncomfortable."  He claimed he had "never been in that position." He added: "I was totally at sea.  I didn't know how to answer the questions without putting myself in jeopardy or Ms. Doe."  He asserted that he "wanted to tell the truth, but it wasn't going to be heard."  Many times DeLeon asked [petitioner] to tell the truth, but he "didn't feel comfortable with it."

Other defense witnesses included a neighbor, who testified that Doe said she had a "boyfriend at work" and a "house boyfriend," and then quickly said, "no, no, no, I meant at work."  [Petitioner]'s stepmother testified that she saw Doe sit down next to [petitioner] and "cozy" up to him.  [Petitioner]'s father testified that he saw Doe rub [Petitioner]'s hair, put her finger in his ear, place her arms around [petitioner], and slide her hand into his back pocket.  [Petitioner]'s mother testified that she saw Doe run her hands up [petitioner]'s neck and "tickle" it, "shush" him by placing her fingers on his lips, and slide under [petitioner]'s arm in a restaurant.

<u>People v. Randel</u>, No. A132185, 2012 WL 6734678, at *1-3 (Cal. Ct. App. Dec. 26, 2012).

//

4

# III. DISCUSSION

## A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

United States District Court
Northern District of California

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. Sumner v. Mata, 449 U.S. 539, 546-47 (1981); Bragg v. Galaza, 242 F.3d 1082, 1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. Id. Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340; see also Torres v. Prunty, 223 F.3d 1103, 1107 (9th Cir. 2000).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

The state court decision to which 2254(d) applies is the "last reasoned decision" of the state court. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005). Here, the court of appeal, in its opinion on direct review, did not address the claims petitioner raises in the instant petition. The last reasoned state court decision as to claims 1, 4, 5, and 6 is the decision by the state superior court denying habeas relief. Ex. 9. The last reasoned state court decision for claim 3 comes from the trial court's ruling on petitioner's Miranda motion. Ex. 2 at 678-82. No court issued a reasoned decision as to claims 2 and 7. When presented with a state court decision that is unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review of the record to determine whether the state court decision is objectively reasonable. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). This "[i]ndependent review . . . is not de novo review of the constitutional

6

issue, but rather, the only method by which [a federal court] can determine whether a silent state court decision is objectively unreasonable." See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." See Harrington v. Richter, 562 U.S. 86, 98 (2011).

**B.    Petitioner's Claims**

Petitioner asserts the following grounds for relief: (1) illegally obtained evidence was used against him; (2) his Sixth Amendment right to counsel was violated when police and the victim deliberately elicited incriminating statements from petitioner; (3) his Miranda[4] rights were violated; (4) the prosecution violated Brady[5]; (5) the prosecution knowingly used false or perjured testimony; (6) trial counsel rendered ineffective assistance; and (7) appellate counsel rendered ineffective assistance.[6]  The Court addresses these claims in turn.

### 1.    Illegally Obtained Evidence

Petitioner claims the pretext phone call between him and Doe was illegally obtained evidence and therefore its introduction violated his right to due process.  Petitioner contends that because Doe was a minor, the government was required to obtain the permission of her legal guardian before she made the call.  Pet. at 10.[7]  Because the pretext phone call was not obtained in violation of federal law, federal habeas relief is unavailable for this claim.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991).  Petitioner identifies no federal authority, nor is the Court aware of any, requiring the government to obtain the permission of a minor victim's legal guardian before allowing her to

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

[5] Brady v. Maryland, 373 U.S. 83 (1963).

[6] Petitioner also asserts various entrapment claims and a claim that the California Court of Appeal improperly denied his state habeas petition.  These claims were previously dismissed.  See Dkt. No. 5.

[7] In citing to the petition, the Court references the page numbers provided on the upper right-hand corner of each page as assigned by the Court's electronic filing system.

United States District Court
Northern District of California

initiate a pretext phone call.  In the absence of clearly established Supreme Court authority, federal habeas relief is unavailable.  See Knowles v. Mirzayance, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."); Carey v. Musladin, 549 U.S. 70, 74 (2006) (denying habeas relief in absence of clearly established federal law).

Petitioner claims that the call violated California Penal Code section 701.5, Use of Minor Informants.  Pet. at 10.  Federal habeas relief is not available for violations of state law.  Estelle, 502 U.S. at 67.  In addition, the Sonoma County Superior Court's ruling, on state habeas, that Doe was not a "minor informant" under the statute is binding on this court.  See Ex. 9 at 2.  Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").  Finally, the statute clearly does not apply to Doe.  California Penal Code section 701.5(e) defines a "minor informant" as "a minor who participates, on behalf of a law enforcement agency, in a prearranged transaction or series of prearranged transactions with direct face-to-face contact with any party, when the minor's participation in the transaction is for the purpose of obtaining or attempting to obtain evidence of illegal activity by a third party and where the minor is participating in the transaction for the purpose of reducing or dismissing a pending juvenile petition against the minor."  Doe was not involved in a prearranged transaction with petitioner, did not have direct face-to-face contact with petitioner, and did not have a pending juvenile petition against her.

Petitioner's reliance on United States v. Watson, 118 F.3d 1315, 1318 (9th Cir. 1997) is misplaced.  Pet. at 10.  The court in Watson held that evidence obtained as the result of an illegal search or seizure is inadmissible in the government's case in chief or as substantive evidence of guilt.  Id. at 1318.  To the extent petitioner claims that the pretext phone call was the result of an illegal search or seizure, the Supreme Court decision in Stone v. Powell, 428 U.S. 465 (1976) precludes federal habeas relief.  The Supreme Court held in Stone, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie for a claim that evidence recovered through an illegal search or seizure was

introduced at trial.  Id. at 482.  Petitioner does not claim that he was not provided an opportunity to fully litigate this issue at trial.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 2.    Right to Counsel

Petitioner claims the introduction of evidence of the pretext phone call violated his right to counsel under Massiah v. United States, 377 U.S. 201 (1964).  Pet. at 11.  Because the pretext phone call occurred before charges were filed, the state court reasonably determined it did not violate petitioner's Sixth Amendment right to counsel.

In Massiah, 377 U.S. at 206, the Supreme Court found the government violated the defendant's Sixth Amendment right to counsel by deliberately eliciting a statement he had made after his indictment.  However, the Supreme Court has "firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him."  Kirby v. Illinois, 406 U.S. 682, 688 (1972).  By its own terms, the Sixth Amendment "becomes applicable only when the government's role shifts from investigation to accusation."  Moran v Burbine, 475 U.S. 412, 430 (1986).  Adversarial judicial proceedings are initiated by formal charge, preliminary hearing, indictment, information, or arraignment.  Id. at 429.

Here, the pretext phone called occurred during the investigation phase, before the commencement of adversarial criminal proceedings.  The pretext phone call occurred on June 24, 2009.  Ex. 2 at 1178-80, 1585.  The felony complaint was filed on June 26, 2009.  Ex. 1 at 1-4. Because petitioner had no Sixth Amendment right to counsel at the time of the pretext phone call, the state court reasonably determined that the call did not violate the Sixth Amendment.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 3.    Miranda Claim

Petitioner claims that the admission of the statements from his interview with DeLeon taken after he said, "Well, I'm gonna be honest with you, with this kind of a deal, I'm not gonna say anything 'cause my attorney says don't say nothing," violated his Miranda rights, his right to remain silent, and his privilege against self-incrimination and was involuntary in violation of due

United States District Court
Northern District of California

1   process.  Pet. at 12-14.[8]  The trial court's ruling that there was no constitutional violation was not

2   an objectively unreasonable application of clearly established Supreme Court precedent.

3        In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that certain warnings

4   must be given before a suspect's statement made during a custodial interrogation can be admitted

5   into evidence.  Miranda requires that a person subjected to custodial interrogation be advised that

6   "he has a right to remain silent, that any statement he does make may be used as evidence against

7   him, and that he has a right to the presence of an attorney."  Miranda, 384 U.S. at 444.  The

8   warnings must precede any custodial interrogation, which occurs whenever law enforcement

9   officers question a person after taking that person into custody or otherwise significantly deprive a

10  person of freedom of action.  Id.

11       Under the right to counsel established in Miranda and refined in Edwards v. Arizona, 451

12  U.S. 477 (1981): "If the suspect effectively waives his right to counsel after receiving the Miranda

13  warnings, law enforcement officers are free to question him.  But if a suspect requests counsel at

14  any time during the interview, he is not subject to further questioning until a lawyer has been

15  made available or the suspect himself reinitiates conversation."  Davis v. United States, 512 U.S.

16  452, 458 (1994) (citation omitted).  However, "if a suspect makes a reference to an attorney that is

17  ambiguous or equivocal in that a reasonable officer in light of the circumstances would have

18  understood only that the suspect might be invoking the right to counsel, our precedents do not

19  require the cessation of questioning.  Rather, the suspect must unambiguously request counsel."

20  Id. at 459.  This is an objective inquiry.  Id.  If a suspect makes an ambiguous or equivocal

21  statement, law enforcement officers are not required to ask clarifying questions or to stop

22  questioning him.  Id. at 461-62.  In Davis, the Supreme Court found that the suspect's statement,

23  "Maybe I should talk to a lawyer," did not constitute an unequivocal request that required the

24  interrogation to cease.  Id. at 462.

25       The Davis standard also applies in determining whether an accused has unambiguously

26  invoked his or her Miranda right to remain silent.  Berghuis v. Thompkins, 560 U.S. 370, 381

27  _____

28  [8] The petition makes these contentions in three separate claims.  In its order to show cause, the
    Court subsumed them into a single claim.  See Dkt. No. 5.

    United States District Court
    Northern District of California

    10

(2010).  An accused who wants to invoke his or her right to remain silent must do so

unambiguously.  Id.  Giving the Miranda warnings dispels whatever coercion is inherent in the

context of custodial interrogation.  Id. at 382.  In Berghuis, the defendant did not unambiguously

invoke his right to remain silent by not speaking for the first two hours and 45 minutes of a three-

hour interrogation.  Id. at 375-76, 381-82.  Because he did not say he wanted to remain silent or

that he did not want to talk to the police, he did not invoke his right to remain silent.  Id. at 382;

compare DeWeaver v. Runnels, 556 F.3d 995, 1002 (9th Cir. 2009) (request to go back to jail cell

was not an unambiguous invocation of right to remain silent); with Anderson v. Terhune, 516 F.3d

781, 787 (9th Cir. 2008) (en banc) ("I plead the Fifth" was unambiguous invocation).

The Supreme Court has held that a confession is voluntary if it is "the product of an

essentially free and unconstrained choice"; it is involuntary where the suspect's "will has been

overborne and his capacity for self-determination critically impaired."  Culombe v. Connecticut,

367 U.S. 568, 602 (1961).  To make this determination, the court must consider the totality of the

surrounding circumstances, including "the characteristics of the accused and the details of the

interrogation."  Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). "While each confession

case has turned on its own set of factors justifying the conclusion that police conduct was

oppressive, all have contained a substantial element of coercive police conduct."  Colorado v.

Connelly, 479 U.S. 157, 163-64 (1986).  Where a suspect's statement is not coerced, "little

justification exists for permitting the highly probative evidence of a voluntary confession to be

irretrievably lost to the factfinder."  Oregon v. Elstad, 470 U.S. 298, 312 (1985).  In Thompkins,

the defendant's statement was not coerced because he did not claim that the police threatened or

injured him and the interrogation was in a standard-sized room in the middle of the afternoon and

lasted three hours.  Thompkins, 560 U.S. at 386-87.

Here, Detective DeLeon read petitioner his Miranda rights, and petitioner waived them at

the beginning of the interview. Ex. 1 at 484-85.  Petitioner nodded his head to indicate he

understood his Miranda rights. Ex. 2 at 642-44.  The trial court found that the Miranda

advisement was sufficient and that petitioner initially waived his rights, and petitioner did not

dispute that finding. Ex. 2 at 672.  Petitioner concedes the validity of his initial waiver in the

present petition.  Pet. at 12-14.

After DeLeon and petitioner talked about petitioner's general background, DeLeon asked if petitioner had ever been arrested.  Ex. 1 at 492.  Petitioner said he had a "Spousal" and also a DUI that he got "in February."  Id.  Petitioner said he had an attorney, Martin Woods, who was expensive but "a really good guy."  Ex. 1 at 522.  DeLeon asked petitioner if he ever physically disciplined Doe.  Petitioner denied slapping or hitting Doe but admitted having punched her in the car and leaving a bruise.  Ex. 1 at 522-25.  DeLeon then began questioning petitioner about whether he and Doe physically showed affection.  Ex. 1 at 528.  Petitioner said that all they did was hug, kiss and give high-fives.  Ex. 1 at 528-29.  He denied being any more affectionate with Doe.  Ex. 1 at 531, 533, 536-38.  Petitioner denied having sex with Doe or anything close to sex.  Ex. 1 at 541.  DeLeon told petitioner that Doe had passed a lie detector test in which she said that she and petitioner had sex.  Ex. 1 at 542, Ex. 2 at 669.  Petitioner said he did not believe it, and DeLeon stated that lie detector tests are not admissible in court.  Ex. 1 at 542.  DeLeon said it was hard to reconcile the lie detector test results with petitioner's complete denial and asked more questions about whether any sexual contact had occurred.  Ex. 1 at 543-47.  Petitioner denied any contact other than kissing her on the lips.  Ex. 1 at 546.  DeLeon said he would take another look at the lie detector results.  Ex. 1 at 547.

The interview proceeded as follows:

Petitioner: Well, I'm gonna be honest with you, with this kind of a deal, I'm not gonna say anything 'cause my attorney says don't say nothing.

DeLeon: Okay.

Petitioner: And this is serious.

Deleon: It is.

Petitioner: Yes.

DeLeon: Okay.

Petitioner: Okay.

DeLeon: So you don't have to say anything, but let me just tell you this—

1

Petitioner: 'Cause that's not right.

2

DeLeon: What if—

3

Petitioner: It's not fair.

4

Ex. 1 at 547-48.

5

DeLeon next informed petitioner that he was on the phone when Doe had called him

6

earlier.  Petitioner responded that he believed that and was not surprised.  Ex. 1 at 548.  After

7

several more pages of conversation, petitioner proceeded to admit that he had had sex with Doe on

8

at least five occasions and that they had orally copulated each other.  Id. at 558-60.

9

Following a hearing on petitioner's Miranda motions, the trial court found the statement to

10

be admissible.  Ex. 2 at 678-82.  The trial court observed that the overall nature of the

11

interrogation was casual and seemed more like a discussion than an interrogation.  Id. at 679.  The

12

court noted that petitioner often engaged DeLeon in further discussion and provided additional

13

information.  Id.  The court found thereupon that petitioner's statement was voluntary.  Id. at 681.

14

The trial court determined that petitioner's statement referencing his attorney was

15

ambiguous at best.  Ex. 2 at 679.  The trial court noted that while DeLeon did not make a great

16

effort to clarify petitioner's statement, he reminded petitioner that he did not have to say anything.

17

Ex. 1 at 548, Ex. 2 at 680.  Petitioner interrupted DeLeon and said it was not fair, which led to a

18

further discussion.  Ex. 2 at 680.[9]  The trial court noted that petitioner kept supplying information

19

to DeLeon's "fairly vague questions."  Ex. 2 at 680.  The court concluded that petitioner was not

20

"invoking his right to remain silent or his right to have an attorney present during questioning."

21

Id. at 680.

22

The trial court's determination that petitioner's statement that he was not going to say

23

anything because his attorney—presumably his attorney for his spousal abuse and DUI cases—

24

had told him not to say anything was not an unambiguous request for counsel or an unambiguous

25

26

27

28

---

[9] Petitioner's statements "that's not right" and "[i]t's not fair" appear to refer to Doe's accusations against him as opposed to the fact that he was being questioned without an attorney.  During the interview, petitioner responded to Doe's accusations, as communicated though DeLeon, by saying:  "If she says that, she's being mean," Ex. 1 at 55, "I don't think it's right," id. at 64, and "It can't be a one-sided story," id. at 73.

United States District Court
Northern District of California

1    invocation of his right to remain silent was not an objectively unreasonable application of clearly

2    established Supreme Court authority.  The record supports a finding that petitioner did not ask for

3    the questioning to stop or request the presence of his attorney, but merely stated what his attorney

4    had advised him in previous cases.

5         Circuit precedent demonstrates that the state court's application of <u>Davis</u> in this case was

6    not unreasonable.  In <u>Sechrest v. Ignacio</u>, 549 F.3d 789, 807 (9th Cir. 2008), when an officer

7    began questioning the petitioner, he said he had spoken with his attorney and been advised by the

8    attorney to "keep his mouth shut."  "This mention of an attorney and reference to advice from an

9    attorney is not an unambiguous request for counsel."  <u>Id.</u>  Accordingly, the questioning could

10   continue after the petitioner's reference to his attorney's advice.  <u>Id.</u>  The present case is virtually

11   identical to <u>Sechrest</u>.  Petitioner's statement that his attorney "says don't say nothing" was merely

12   a mention of his attorney and advice from his attorney, not an unambiguous request for his

13   attorney to assist him in this case.

14        The state court also reasonably determined that petitioner's statement "I'm not gonna say

15   anything" was not an unambiguous invocation of his right to remain silent.  He did not say that he

16   wished to remain silent or ask for questioning to end, either of which which would have been

17   unambiguous. <u>Berghuis v. Thompkins</u>, 560 U.S. at 382.  DeLeon said, "Okay," and agreed with

18   petitioner that Doe's allegations were serious.  DeLeon was not required to seek clarification of

19   petitioner's ambiguous statement.  <u>Davis</u>, 512 U.S. at 461-62.  However, as the trial court

20   observed, after DeLeon reminded petitioner that he did not have to say anything, petitioner

21   continued participating in the discussion.  On this record, the state court reasonably determined

22   that petitioner's statement was ambiguous and did not require the cessation of questioning.

23        Finally, the state court made a reasonable determination that petitioner's statement was

24   voluntary.  The interview lasted approximately two hours and occurred during the day.  Ex. 2 at

25   642, 644, 1586, 1595.  Petitioner was a 53-year-old man with prior experience in the criminal

26   justice system.  Ex. 1 at 486, 492.  The tone of the interview was casual.  Ex. 2 at 679.  The

27   interview occurred under ordinary circumstances, petitioner was a middle-aged man who had been

28   arrested before, and there was no evidence that DeLeon threatened or coerced him.  <u>See</u>

United States District Court
Northern District of California

14

1   Thompkins, 560 U.S. at 386-87.

2       Petitioner contends his statement was involuntary because DeLeon lied when he said that

3   Doe had passed a lie detector test.  Pet. at 14.  Misrepresenting evidence the police have against a

4   suspect, while relevant, does not render an otherwise voluntary statement involuntary.  Frazier v.

5   Cupp, 394 U.S. 731, 739 (1969) (confession voluntary even though officer falsely told suspect his

6   co-conspirator had confessed to the crime); United States v. Crawford, 372 F.3d 1048, 1060-61

7   (9th Cir. 2004) (en banc) (trickery, deceit, and even impersonation do not render a statement

8   involuntary).

9       In sum, petitioner has not produced clear evidence that he unambiguously invoked his

10  Miranda rights prior to confessing or that his confession was coerced.  Thus, based on the

11  information in the record, the trial court's factual determinations were not unreasonable in light of

12  the evidence presented at the state court proceeding.  See Miller-El, 537 U.S. at 340.

13      In any event, any error was harmless.  The admission of evidence obtained in violation of

14  Miranda is subject to harmless error analysis.  Arizona v. Fulminante, 499 U.S. 279, 295 (1991);

15  Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002) ("The erroneous admission of statements

16  taken in violation of a defendant's Fifth Amendment rights is subject to harmless error analysis.").

17  In other words, habeas relief is appropriate only if the coerced confession had a "'substantial and

18  injurious effect or influence in determining the jury's verdict.'"  Pope v. Zenon, 69 F.3d 1018,

19  1025 (9th Cir. 1995)[10] (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

20      In the present case, in the pretext phone call with Doe, petitioner promised not to have sex

21  with her again.  Ex. 1 at 465.  When Doe said she was only 15, petitioner admitted "I expected

22  way too much from you."  Id. at 466.  He repeatedly apologized and said he did not realize he was

23  putting Doe "through hell."  Id.  When Doe added that petitioner hit her "all those times," he told

24  her not to bring that up because it made him "feel like shit."  Petitioner said, "I shouldn't have hit

25  you, and I do have a bad temper, and I'm sorry."  Id.  Petitioner also agreed not to lick Doe's

26  vagina.  Id. at 468.  In addition, petitioner testified at trial that he and Doe were in an "intimate

27

28  _____
[10] overruled on other grounds by United States v. Orso, 266 F.3d 1030, 1038 (9th Cir. 2001).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  sexual relationship." Ex. 2 at 1720.  He testified that they had had sexual intercourse "many

2  times" and that they had performed oral sex on each other.  Id. at 1722, 1724.  Because petitioner

3  admitted in the pretext call to having had sex with Doe and hitting her and admitted at trial to

4  having sexual intercourse and to orally copulating Doe, it cannot be said that the admission of his

5  statement made during interrogation had a substantial and injurious effect on the verdict.

6      Accordingly, petitioner is not entitled to habeas relief on this claim.[11]

7      **4.      Brady Claim**

8      Petitioner claims the prosecution withheld evidence of Doe's orthodontic records in

9  violation of Brady v. Maryland, 373 U.S. 83 (1963).  Pet. at 15.  Petitioner filed a motion for a

10 new trial on the grounds that the records constituted "newly discovered evidence," warranting a

11 new trial.  Ex. 1 at 730-37.  The trial court denied the motion and found that no Brady violation

12 had occurred.  Ex. 1 at 783-87.  In addition, the Sonoma County Superior Court ruled, on state

13 habeas, that petitioner "fail[ed] to demonstrate the People committed any Brady violation with

14 respect to the victim's dental/orthodontic records."  Ex. 9 at 2.  These findings are supported by

15 the record.

16     In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of

17 evidence favorable to an accused upon request violates due process where the evidence is material

18 either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Id.

19 at 87.  The Brady rule includes impeachment evidence, which is favorable to the defendant if it "it

20 may make the difference between conviction and acquittal."  United States v. Bagley, 473 U.S.

21

22  [11] Respondent alternatively argues that petitioner's Miranda claim (claim 3), as well his Brady
23  claim (claim 4), are procedurally defaulted because the Sonoma County Superior Court
    determined that petitioner could not raise the claims on state habeas where he failed to raise them
24  on appeal.  A federal court will not review questions of federal law decided by a state court if the
    decision also rests on a state law ground that is independent of the federal question and adequate
25  to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  Under California
    law, a petitioner is barred from raising a claim on habeas corpus that could have been but was not
26  raised on appeal.  In re Harris, 5 Cal. 4th 813, 834 (1993); In re Dixon, 41 Cal. 2d 756, 759
    (1953).  The United States Supreme Court recently held that California's Dixon rule is both
27  adequate and independent such as to foreclose federal habeas review.  See Johnson v. Lee, No. 15-
    789, slip op. at 1 (U.S. May 31, 2016) (finding California's Dixon rule both adequate and
28  independent because it is "longstanding, oft-cited, and shared by habeas courts across the
    Nation").  Accordingly, claims 3 and 4 are also denied on this alternative procedural ground.

1    667, 676 (1985).  In order to succeed on a Brady claim, a petitioner must show: (1) that the

2    evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2)

3    that it was suppressed by the prosecution, either willfully or inadvertently; and  (3) that it was

4    material (or, put differently, that prejudice ensued).  Banks v. Dretke, 540 U.S. 668, 691 (2004).

5    Evidence is material if "there is a reasonable probability that, had the evidence been disclosed, the

6    result of the proceeding would have been different."  Cone v. Bell, 556 U.S. 449, 469-70 (2009).

7    There is no Brady violation "where the defendant is aware of the essential facts enabling him to

8    take advantage of any exculpatory evidence," even if the government failed to bring the evidence

9    to the attention of the defense.  Raley v. Ylst, 470 F.3d 792, 804 (9th Cir. 2006).

10          In the present case, Doe testified that petitioner had once hit her on the mouth, causing a

11   cut on her gums because she was wearing braces.  Ex. 2 at 786.  Defense counsel requested Doe's

12   records from her orthodontist, who provided them during the trial.  Ex. 1 at 727, Ex. 2 at 1393.

13   Defense counsel gave the phone number and contact information of an employee at the

14   orthodontist's office to the prosecution's investigator, Lisa Chapman, because the poor quality of

15   the copies of the records made ascertaining the dates of service difficult.  Ms. Chapman contacted

16   the employee of the orthodontist's office by telephone.  The employee confirmed the dates of

17   service and told Ms. Chapman that Doe's braces were removed on July 13, 2009, that defense

18   counsel had sent a letter, not a subpoena, requesting the records, and that the records contained no

19   notations of injuries, but that they would have if any injuries had been noted during the visits.

20   After the phone call with the orthodontist's employee, Ms. Chapman called the prosecutor and

21   defense counsel and verbally provided to each of them all of the information she had learned.  Ex.

22   1 at 736, 770-71.  At the close of evidence, the parties stipulated to the dates Doe had orthodontic

23   appointments from August 31, 2006 to July 13, 2009.  Ex. 2 at 2074-75.  In closing argument,

24   defense counsel argued that the prosecution's failure to produce evidence from the orthodontist

25   showed that Doe was lying about the injuries to the inside of her mouth.  Ex. 2 at 2290-91.

26          Petitioner filed a motion for a new trial based on the discovery of new evidence that was

27   known to the prosecution but not disclosed during trial.  Ex. 1 at 730-33.  Defense counsel stated

28   in a declaration attached to the motion that he had caused a subpoena to be served on Doe's

United States District Court
Northern District of California

17

orthodontist during trial and that he and the prosecution received two sets of records from the orthodontist.  Defense counsel indicated that the defense wished to enter the records into evidence in order to argue that they did not corroborate Doe's testimony about the injuries inside her mouth but that the prosecution would not stipulate to their admission into evidence.  Id. at 735A.  The prosecution was willing to stipulate to the dates of service, however, and did so, as noted above. Defense counsel said that after trial petitioner received a letter from Doe's orthodontist indicating that the records showed no injuries.  Id. at 727, 735-735A.  Defense counsel attached a declaration from the employee of the orthodontist's office with whom Ms. Chapman had communicated.  The employee verified that she confirmed the dates of service for Ms. Chapman and told her that the records showed no cuts, scrapes or swelling, but that the orthodontist would have noted injuries in the charts.  Id. at 736.  In an attachment to the opposition to the motion, the prosecution filed a declaration by Ms. Chapman indicating that she had told defense counsel everything she had learned in a phone call, as described above.  Id. at 771.

The trial court issued a written ruling denying the motion for a new trial.  Ex. 1 at 783-87. The trial court observed that the alleged "new evidence" was not evidence at all, but rather a lack of evidence, which would not support a new trial under California Penal Code section  1181.  Id. at 785-86.  The trial court also noted that "during the course of defendant's closing argument defense counsel argued the very point raised in their motion," by pointing out the prosecution's failure to call the orthodontist to testify about injuries to the inside of Doe's mouth.  Id. at 785. The trial court noted that "nothing prevented defense counsel from calling either Jane Doe's orthodontist or the custodian of records from the orthodontic office to testify as to the lack of documentation regarding the injuries claimed by Jane Doe."  Id. at 786.  The trial court ruled that no Brady violation occurred because:

> the alleged newly acquired evidence was clearly in the hands of the defense during the defendant's case-in-chief and the very same evidence was argued to the jury during defense counsel's closing argument. In fact, counsel for the defense used the lack of evidence of documented injuries to attack the credibility and thus the reliability of the alleged victim.

Id.

"When more than one state court has adjudicated a claim, we analyze the last reasoned

decision." <u>Barker</u>, 423 F.3d at 1091; <u>Ylst</u>, 501 U.S. at 805.  Here, the result is the same whether this Court reviews the trial court's ruling or the superior court's denial of the state habeas petition, because both courts reasonably determined that no <u>Brady</u> violation occurred.  Petitioner was aware Doe had braces.  He told DeLeon he had bought them for her.  Ex. 1 at 506.  Before trial, the prosecution provided to the defense a police report that recounted Doe's statement that petitioner had hit her in the face and made it hurt because her jaws were sore from her braces.  <u>Id.</u> at 166, 763.  Doe's orthodontic records were as available to the defense as they were to the prosecution.  Defense counsel conceded that he wanted to introduce Doe's records into evidence in order to argue that they did not corroborate her allegations.  <u>Id.</u> at 735A.  In fact, defense counsel argued that the prosecution's failure to call the orthodontist showed that Doe did not sustain injuries to her mouth from her braces.  Ex. 2 at 2290-91.  On this record, the state court reasonably determined that the prosecution did not suppress evidence.  Moreover, no prejudice occurred because the defense discussed the lack of evidence in the orthodontic records in closing argument, <u>id.</u>, and because petitioner admitted to hitting Doe in his pretext call with her, Ex. 1 at 466.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 5.    False Testimony

Petitioner claims that Doe's testimony that he imposed heavy restrictions on her and that she was afraid of him conflicted with evidence that Doe was socially active and behaved aggressively toward petitioner, and therefore the prosecution knowingly used false or perjured testimony in violation of due process.  Pet. at 16-21.  The Sonoma County Superior Court reasonably ruled, on state habeas, that petitioner "fail[ed] to demonstrate that the prosecutor knowingly introduced false/perjured testimony."  Ex. 9 at 2.

When a prosecutor obtains a conviction by the use of testimony that he knows or should know is perjured, it has been consistently held that such conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury.  <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 103-07 (1976).  The same result obtains when the prosecutor, although not soliciting false evidence, allows it to go uncorrected when it appears.  <u>Napue v. Illinois,</u> 360 U.S. 264, 269 (1959).  If the prosecutor knows that his witness has lied, he has a

United States District Court
Northern District of California

19

constitutional duty to correct the false impression of the facts.  United States v. LaPage, 231 F.3d
488, 492 (9th Cir. 2000).  However, prosecutors will not be held accountable for discrepancies in
testimony where there is no evidence from which to infer prosecutorial misconduct and the
fairness of the trial was not materially affected.  See United States v. Zuno-Arce, 44 F.3d 1420,
1423 (9th Cir. 1995) (no evidence of prosecutorial misconduct where discrepancies in testimony
could as easily flow from errors in recollection as from lies).  In sum, to prevail on a claim based
on Agurs/Napue, the petitioner "must show that (1) the testimony (or evidence) was actually false,
(2) the prosecution knew or should have known that the testimony was actually false, and (3) . . .
the false testimony was material."  Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005) (quoting
United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003) (omission in original)).  "Material"
means that there is a reasonable likelihood that the false evidence or testimony could have affected
the judgment of the jury.  Morris v. Ylst, 447 F.3d 735, 743 (9th Cir. 2006).

Here, petitioner's claim that Doe's testimony conflicted with other evidence does not
establish a knowing presentation of perjury by the prosecution.  See Morales v. Woodford, 388
F.3d 1159, 1179 (9th Cir. 2004) (petitioner must establish a factual basis for attributing knowledge
that the testimony was perjured to the government); Zuno-Arce, 44 F.3d at 1423 ("Lawyers in
criminal cases, for prosecution and defense, sometimes swim in a sea of lies, and must necessarily
trust the jury to determine what is true, or whether reasonable doubt remains about what is true.");
Tapia v. Tansy, 926 F.2d 1554, 1563 (9th Cir. 1991) ("Contradictions and changes in a witness's
testimony alone do not constitute perjury and do not create an inference, let alone prove, that the
prosecution knowingly presented perjured testimony.").

In addition, defense counsel pointed out Doe's alleged inconsistencies to the jury.  See
Allen v. Woodford, 395 F.3d 979, 995 (9th Cir. 2004) (rejecting claim of prosecutorial misconduct
where witness was subjected to impeachment evidence and petitioner failed to establish falsity of
testimony or that government had any reason to believe it was false).  For example, petitioner
claims that Doe's testimony that he did not allow her to go out with friends or boys was
contradicted by notations in her calendar indicating that she went to birthday parties, beach
excursions, football games and swim meets.  Pet. at 16-18.  Doe testified on cross-examination

United States District Court
Northern District of California

that her social life was very limited.  Ex. 2 at 1219-20.  She also testified on cross-examination that she had a calendar on which social events such as friends' birthdays and trips to the beach were noted.  She testified that she could not remember if she attended every event indicated on the calendar because some plans fell through.  Ex. 2 at 1236-42, 1397-1404.  Doe testified that she went to football games and was on the swim and cross-country teams.  Id. at 1430.  Petitioner introduced the calendar into evidence.  Ex. 1 at 586-96.  Thus, Doe was subjected to the allegedly impeaching evidence.  However, Doe also testified that she hid the calendar from petitioner so he would not know about her social activities.  Ex. 2 at 1478.  Therefore, the calendar does not prove Doe's testimony about petitioner's restrictions was false, let alone that the prosecution knew it was false.

All of petitioner's remaining allegations of knowing presentation of perjury fail for the same reasons.  Evidence that Doe had boys at the apartment while petitioner was away and had parties there after petitioner's arrest does not prove that her testimony about petitioner restricting her contact with boys was false or that the prosecution knew it was false.  In fact, evidence that Doe enjoyed her freedom when petitioner was away could tend to show he was strict when he was present.

Likewise, witness statements that Doe was aggressive and disrespectful to petitioner in public does not disprove her testimony that she was afraid of petitioner or establish that the prosecution knew it was false.  In fact, Doe testified that she was verbally aggressive toward petitioner.  Ex. 2 at 1109.  She also would "push [petitioner] off of [her], punch him, slap him, throw things at him so he wouldn't get close to [her]," but that only "made him mad and more angry."  Id. at 1118.  Doe's testimony that she could be physically and verbally aggressive to petitioner is not inconsistent with her testimony that she was afraid of petitioner.

Finally, petitioner contends evidence that Doe had access to a car and a joint checking account with petitioner shows that she could have left him at any time.  Pet. at 19, 21.  Evidence that Doe had a joint checking account with petitioner was introduced at trial.  Ex. 1 at 597.  Doe testified that she went on a two-week trip with her biological father in Denver and returned on June 13, 2009, the last time petitioner forced her to have sex with him.  Ex. 2 at 1100-01.  Thus,

1    the jury was aware Doe had some independence.  However, Dr. Urquiza, the prosecution's expert

2    witness in Child Sexual Abuse Accomodation Sydrome, testified that feelings of helplessness and

3    delayed disclosure were not inconsistent with abuse.  Id. at 1527-30, 1533-36.  Thus, evidence

4    suggesting that Doe could have left petitioner does not prove that her testimony was false or that

5    the prosecution knew that it was false.

6          In any event, Doe's statements cannot be said to have had a material effect on the trial.

7    First, as discussed, the statements were subjected to impeaching evidence.  Second, the evidence

8    against petitioner was strong and included him admitting to abusing Doe.  These admissions came

9    in through the pretext call, through petitioner's custodial interview with DeLeon, and through

10   petitioner's own testimony at trial.  Consequently, there is not a reasonable likelihood that Doe's

11   allegedly false testimony about how strict petitioner was or how afraid she was of him affected the

12   jury's verdict.

13         Accordingly, petitioner is not entitled to habeas relief on this claim.

14   **6.        Ineffective Assistance of Trial Counsel for Failure to Raise Above Issues**

15         Petitioner contends his trial counsel rendered ineffective assistance by failing to raise the

16   above claims, other than the Miranda claims, in the trial court.  Pet. at 22-24.  Petitioner also

17   claims that trial counsel rendered ineffective assistance by failing to object to the restitution fine.

18   Pet. at 28.  The Sonoma County Superior Court reasonably ruled, on state habeas, that petitioner

19   failed to demonstrate any ineffective assistance.   Ex. 9 at 1-2.

20         Claims of ineffective assistance of counsel are examined under Strickland v. Washington,

21   466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of counsel, a petitioner must

22   establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it

23   fell below an "objective standard of reasonableness" under prevailing professional norms, id. at

24   687-88, "not whether it deviated from best practices or most common custom," Harrington v.

25   Richter, 562 U.S. 86, 105 (2011) (citing Strickland, 466 U.S. at 690 ).  "A court considering a

26   claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was

27   within the 'wide range' of reasonable professional assistance."  Id. at 104 (quoting Strickland, 466

28   U.S. at 689).

United States District Court
Northern District of California

United States District Court
Northern District of California

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. Where the petitioner is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. "The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 112 (citing Strickland, 466 U.S. at 693). It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong, i.e., the second factor of the Strickland test, if the petitioner cannot establish incompetence, as required under the first prong. Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential, and when the two apply in tandem, review is doubly so." Richter, 562 U.S. at 105 (quotation marks and citations omitted). "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

As discussed above, the pretext telephone call was not obtained in violation of federal law or of petitioner's right to counsel, and the prosecution did not commit misconduct by failing to disclose exculpatory evidence or by knowingly presenting false testimony. Thus, counsel was not ineffective in opting not to raise these claims. See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance."); Knowles, 556 U.S. at 123 ("[T]his Court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success.").

As to the restitution claim, the Sonoma County Superior Court, on state habeas, determined that "petitioner fail[ed] to demonstrate any error in imposing the restitution fine, or that trial counsel was deficient in failing to object to the fine." Ex. 9 at 2. The state court's determination that the restitution fine was properly calculated is an interpretation of state law that is binding on a federal court in habeas corpus. Bradshaw, 546 U.S. at 76. Petitioner fails to

1    demonstrate that a reasonable attorney would have objected to the imposition of the restitution fine

2    or that the result would have been different had his attorney objected.

3    　　　Accordingly, petitioner is not entitled to habeas relief on this claim.

4    　　　**7.　　　Ineffective Assistance of Appellate Counsel**

5    　　　Petitioner claims that appellate counsel rendered ineffective assistance by failing to raise

6    all of the issues raised in the present petition.  Pet. at 25-27.  The state court reasonably rejected

7    this claim.

8    　　　The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant

9    effective assistance of counsel on his first appeal.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).

10   Claims of ineffective assistance of appellate counsel are reviewed according to the standard set in

11   Strickland.  See Strickland, 466 U.S. at 668; Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.

12   1989).  A petitioner thus must show his counsel's advice fell below an objective standard of

13   reasonableness and that there is a reasonable probability that, but for counsel's unprofessional

14   errors, he would have prevailed on appeal.  Miller, 882 F.2d at 1434 & n.9.

15   　　　Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

16   requested by a criminal defendant.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983).  "[T]he

17   weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate

18   advocacy."  Miller, 882 F.2d at 1434.  Consequently, where appellate counsel "decline[s] to raise a

19   weak issue," he or she will "frequently remain above an objective standard of competence" and,

20   for the same reason, will have caused his client no prejudice.  Id.

21   　　　For the reasons discussed above, the claims presented herein would not have succeeded on

22   appeal.  Appellate counsel therefore cannot be faulted for declining to raise the claims.  See

23   Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001) ("[A]ppellate counsel's failure to raise

24   issues on direct appeal does not constitute ineffective assistance when appeal would not have

25   provided grounds for reversal.")

26   　　　Accordingly, petitioner is not entitled to habeas relief on this claim.

27   //

28   //

United States District Court
Northern District of California

**C.      Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  <u>See</u> Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  <u>Id.</u> § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Chuck Keeton on the docket as the respondent in this action.

IT IS SO ORDERED.

Dated: July 20, 2016

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

25